# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

LAMONT CURTIS,

   Plaintiff,

v.

WEXFORD HEALTH SOURCES, INC.,
COLLIN OTTEY, M.D.,
KRISTA BILAK, RNP,

   Defendants.

Civil Action No.: JKB-18-14

## MEMORANDUM OPINION

In response to this civil rights complaint raising claims of an Eighth Amendment violation, defendants Wexford Health Sources, Inc., Collin Ottey, M.D., and Krista Bilak, RNP, filed a motion to dismiss or for summary judgment. ECF 22, 23.[1] The motion is opposed by plaintiff. ECF 25. Plaintiff has also filed a renewed motion for admission (ECF 21), a motion for Rule 56(f) continuance to conduct discovery (ECF 26), and a motion to appoint counsel (ECF 27). No hearing is necessary to determine the matters now pending before the Court. *See* Local Rule 105.6 (D. Md. 2018). For the reasons that follow, defendants' motion, construed as one for summary judgment, shall be granted and plaintiff's pending motions shall be denied.

### Background

In his verified amended complaint, plaintiff Lamont Curtis states he was diagnosed with polyps on his vocal cord and larynx in 2000, a condition that required surgery by an Ear Nose and Throat (ENT) specialist several times during his confinement at Jessup Correctional Institution (JCI). In February of 2008, Curtis was transferred to North Branch Correctional

---

[1]    The motion was first improperly filed as an "oral motion to dismiss or, in the alternative, motion for summary judgment" at ECF 22. On the same day, the identical documents were again electronically docketed as "correspondence correcting earlier submission," but the submission includes no correspondence. ECF 23.

Institution (NBCI), where he continued to experience problems with the polyps. He states that defendant Dr. Collin Ottey referred him for treatment by an ENT on an unspecified date. ECF 13 at p. 5.

On May 18, 2012, Curtis submitted a sick call slip indicating that his referral to an ENT for surgery was delayed; asking how to file a complaint with the "Physician Board" because of the delay; and stating he needed to be seen by Dr. Ottey. ECF 13 at pp. 5-6 and ECF 13-5. Curtis also indicates in the same sick call slip that he saw an ENT at Bon Secours Hospital on March 13, 2012, where he was advised by Dr. Mumtaz that due to the breathing problems he was experiencing Curtis required surgery. ECF 13-5 at p. 2. Curtis further notes that he had been sent back to see Dr. Mumtaz on March 23, 2012, which he characterizes as a mistake because Mumtaz had already recommended surgery for him due to his difficulties breathing at night. *Id.*

In a consultation report dated March 27, 2012, Dr. Mumtaz indicates that Curtis was advised that he has "a recurrence of the left vocal cord polyps and papillomas" that had not progressed to a size that obstructed his airway. ECF 13-2. Dr. Mumtaz "re-advised" Curtis to "have the papillomas removed" and indicated that the papillomas will keep coming back. *Id.* The only available treatment at Bon Secours, according to the report, is surgical removal of the papillomas, but Dr. Mumtaz indicated that there are "experimental treatments including antiviral injections" for treatment of recurrent polyps and papillomas. *Id.* The recommended surgery was performed on June 12, 2012. ECF 13 at p. 6.

On August 14, 2012, Curtis was seen by Dr. Mumtaz for a post-surgical exam. ECF 13 at p. 7. Dr. Mumtaz indicated that Curtis was experiencing no post-surgical complications and there was no evidence of polyps or papillomas. ECF 13-2. The consultation report further indicates that during the surgical excision of the papillomas it was discovered Curtis had

extensive subglotic papillomas that were also excised during surgery. *Id*. Dr. Mumtaz advised that Curtis would "need to be evaluated in three months and, depending on the recurrence rate, he may need laryngoscopic biopsy again." *Id*.

On December 23, 2012, Curtis filed another sick call slip indicating he had surgery on June 12, 2012, and he was concerned about missing follow-up appointments because he had been advised by Dr. Mumtaz that he needed to keep track of his breathing and progress. ECF 13 at p. 6; ECF 13-7.

In August of 2015, Curtis began experiencing problems with hoarseness of his voice, shortness of breath, and throat pain. ECF 13 at p. 7. He submitted a sick call slip requesting to be seen and he was seen by Krista Bilak, RNP, who submitted a referral for Curtis to be seen by an ENT. *Id*. By September 1, 2015, Curtis's symptoms worsened. ECF 13 at p. 7.

On October 30, 2015, Curtis received written notice from Krista Bilak that the request for an ENT consult had been denied. ECF 13-1. Bilak indicated that the denial indicated Curtis should continue receiving "conservative treatment" for 90 days and that she would follow up with Curtis in one month. *Id*. Curtis alleges that Dr. Ottey denied the request. ECF 13 at p. 7.

Curtis claims that despite knowing his symptoms had worsened, Bilak and Ottey prescribed steroids, throat lozenges, and a soft diet, rather than sending him to see an ENT. ECF 13 at p. 8. He asserts that Bilak and Ottey knew the treatment they prescribed was "useless" and claims it was simply a delay tactic. *Id*. In support of his allegation, Curtis refers to Dr. Mumtaz's consultation report indicating that the only treatment for recurrent papillomas and polyps was surgical removal. *Id*., *see also* ECF 13-2.

On December 8, 2015, Curtis was examined by Dr. Mumtaz. ECF 13-8. In his Consultation Report, Dr. Mumtaz indicates that Curtis was currently experiencing worsening

3

hoarseness of his voice as well as respiratory problems and feeling "like his throat was closing up." *Id*. at p. 1. The physical examination note indicates, however, that Curtis was "not having any airway problem." *Id*. Dr. Mumtaz found that Curtis now had a papilloma of the right vocal cord and a smaller one on the left vocal cord and concluded that Curtis had "recurrent laryngeal papillomatosis."[2] *Id*. at pp. 1-2. He recommended that Curtis undergo a "repeat microlaryngoscopy with removal of papilloma with coblation." *Id*. at p. 2. Curtis claims that Dr. Ottey caused a delay in surgery being scheduled because he did not process the request with Bon Secours Hospital. ECF 13 at p. 8. This delay resulted in Dr. Mumtaz not performing the surgery. *Id*.

Curtis states he did not receive the surgery recommended by Dr. Mumtaz until July 6, 2016, when ENT Dr. Elizabeth Guardini performed the surgery at University of Maryland Medical Center (UMMC). ECF 13 at p. 9. He further asserts that Dr. Ottey has denied Curtis access to follow-up examinations with an ENT since January 2014 and caused him to suffer for ten months (from September 1, 2015 to July 6, 2016) by denying him access to surgery. *Id*. Curtis states that during the ten-month delay he suffered from the progression of his condition, which caused hoarseness, shortness of breath, an inability to exercise due to labored breathing, pain, and discomfort. *Id*. at p. 11. Despite his worsening symptoms, Curtis alleges that no efforts, or inadequate efforts, were made to secure the needed surgery for his condition. *Id*. at pp. 11-12.

---

[2] Recurrent laryngeal papillomatosis "is a disease in which benign (noncancerous) tumors called papillomas grow in the air passages leading from the nose and mouth into the lungs (respiratory tract). Although the tumors can grow anywhere in the respiratory tract, they most commonly grow in the larynx (voice box)—a condition called laryngeal papillomatosis. The papillomas may vary in size and grow very quickly. They often grow back after they have been removed." https://www.nidcd.nih.gov/health/recurrent-respiratory-papillomatosis (last visited February 7, 2019). There is no current cure and the condition is generally treated through surgical removal of the growths. *Id*.

4

Curtis claims that Wexford Health Source, Inc. (Wexford), the private healthcare provider under contract with the Maryland Division of Correction, "implemented corporate policies by which the treatment of individuals with serious medical conditions . . . was postponed, delayed, or denied." ECF 13 at p. 10. He states that these policies, which "denied timely and appropriate access to licensed physicians, pain medication, and appropriate medical and surgical procedures and treatments," amount to deliberate indifference to his serious medical needs and resulted in the infliction of pain and mental anguish. *Id*. As relief, Curtis seeks monetary damages.

Defendants admit there was a delay in providing Curtis with the surgery he required but state, via a declaration under oath by Dr. Asresahegn Getachew, that the delay was due to the fact that the surgery was scheduled to be performed at Bon Secours Hospital and had to be rescheduled at University of Maryland Medical System (UMMS). ECF 22-5 at pp. 3 & 4-5. Further, they assert the delay was two months long, not the ten months alleged by Curtis. *Id*. at pp. 4-5. They provide the following explanation regarding the period of time between September 21, 2015, the date Curtis began to complain of symptoms, and July 6, 2016, the date the surgery was provided.

When Curtis initially complained on September 21, 2015, his presenting symptom was hoarseness without pain or difficulty swallowing. ECF 22-4 at p. 2; ECF 22-5 at p. 2, ¶ 7. On September 24, 2015, Ricki Moyer, RN, noted that Curtis was complaining of a sore throat and had a history of throat polyps; Curtis's vital signs were within normal limits. ECF 22-4 at p. 3. Moyer referred Curtis to a provider. *Id*. at p. 5. That referral took place on September 30, 2015, when Curtis was seen by Janette Clark, NP. ECF 22-4 at p. 6. Clark reviewed Curtis's case with the Regional Medical Director (RMD) and Curtis was prescribed an oral steroid, prednisone, and

5

Curtis was provided throat lozenges. *Id*. at pp. 6-7. Clark also indicated that a referral to an ENT would be requested. *Id*. at p. 7.

As alleged by Curtis, the referral to an ENT was denied sometime in October of 2015,[3] however, defendants assert the denial was due to the "minimal symptoms" Curtis was experiencing at the time. ECF 22-5 at p. 2, ¶ 7. The collegial review "proposed an alternative treatment plan of conservative therapy to include steroids for inflammation, throat lozenges and soft food" with a re-evaluation in 90 days. *Id*. Curtis continued to complain of worsening symptoms; on October 27, 2015, Curtis reported to Robert Claycomb, RN, that he was experiencing difficulty with swallowing and breathing. ECF 22-4 at p. 12. At that time, Curtis was receiving only throat lozenges and Claycomb apparently thought the referral to an ENT was still pending. *Id*. at pp. 12-13.

On October 30, 2015, Curtis again reported that his symptoms were worsening when he was seen by defendant Krista Bilak, RNP, who noted that Curtis was experiencing shortness of breath when lying flat and described a feeling as if his throat was closing off. ECF 22-4 at p. 14. Bilak discussed the case with the Regional Medical Director and resubmitted the ENT consult request. *Id*. That request was approved on November 5, 2015. *Id*. at p. 18.

On December 8, 2015, Curtis was seen at Bon Secours Hospital by Dr. Mumtaz for a laryngoscopy. ECF 22-5 at p. 3, ¶ 8. Mumtaz recommended surgical removal of the papillomas he found on Curtis's vocal cords and a consultation request for the surgery was submitted on December 10, 2015, by Renato Espina, M.D. ECF 22-4 at p. 23. Following his laryngoscopy, Curtis was admitted to the prison infirmary at Western Correctional Institution (WCI), where he

---

[3] Curtis was informed of the denial on October 30, 2015, but was not told when the denial occurred. ECF 13-1. Defendants do not provide the date the consult was actually denied. ECF 22-5 at p. 2.

6

was monitored and it was noted that his speech was clear, his breathing was not labored, and he denied any difficulty in swallowing. *Id*. at pp. 21-22.

Curtis returned to NBCI and sought care there on December 14, 2015, because his throat was sore. ECF 22-4 at p. 24. Dr. Mahboob Ashraf ordered lozenges for Curtis's sore throat and Motrin. *Id*. at p. 25. The surgical removal of the papillomas found by Dr. Mumtaz was approved through collegial review on December 17, 2015. *Id*. at p. 26.

On January 6, 2016, Curtis was seen by Krista Bilak, who noted that Curtis's symptoms of laryngeal papillomatosis had reoccurred six months prior. ECF 22-4 at p. 27. Curtis's vital signs, including his rate of respiration and his pulse oximeter, were normal. *Id*. Curtis was receiving throat lozenges as well as Motrin, and those medications were continued. *Id*. Bilak put in another consultation request on January 9, 2016, for the surgical removal of the papillomas found by Dr. Mumtaz. *Id*. at p. 29. That request was again approved through collegial review on January 21, 2016. *Id*. at p. 30.

When Curtis was seen on January 27, 2016, for complaints of throat pain, he reported to Krista Bilak that the Motrin he had been taking was ineffective to control the pain. ECF 22-4 at p. 31. Bilak changed the prescription to Naproxen and noted the surgery was approved on January 21, 2016. *Id*.

On February 15, 2016, Curtis complained that the hoarseness and the throat pain he was experiencing were worsening. ECF 22-4 at p. 33. His vital signs were normal and he denied problems with swallowing or breathing. *Id*. He was provided with a refill for throat lozenges and told his surgery had been approved. *Id*. at pp. 33-34.

In a document dated February 19, 2016, it is noted that Dr. Getachew approved Curtis for an ENT evaluation at UMMS because Curtis's previous approval for the surgery was with Dr.

7

Villanueva at Bon Secours and Dr. Villanueva no longer performed the procedure. ECF 22-4 at p. 35; ECF 22-5 at p. 3, ¶ 9. The consultation request for UMMS ENT evaluation was submitted on March 1, 2016. ECF 22-4 at p. 36.

Another consultation request was submitted by Dr. Ashraf on May 17, 2016. ECF 22-4 at p. 42. That request was approved on May 19, 2016. *Id*. at p. 43.

On June 12, 2016, Curtis was assigned to segregation and complained about a sore throat; he was again provided with throat lozenges. *Id*. at p. 44. Later that same month, Curtis was given a pre-operative examination by Krista Bilak. *Id*. at p. 45. She noted that Curtis's respiratory system was normal and recorded his vital signs within normal range. *Id*. at p. 46.

On July 6, 2016, Curtis was sent to UMMS, where he underwent the surgical removal of three papillomas, which were biopsied and found to be benign. *Id*. at pp. 47-51.

Dr. Getachew explains the collegial review process in his declaration under oath. He states:

> Generally, patients for whom specialty consultations are sought are placed on a list by the onsite primary medical providers for circulation to participants in the utilization review process. At a designated date and time for each correctional facility, primary medical providers tasked with presenting cases for review would participate in a conference call with a Wexford utilization review physician and utilization review nurse. During that conference call, the primary medical provider would identify the specialty care sought and provide information he or she deemed pertinent regarding the patient in support of that request for specialty care. This process is referred to as collegial review. Following presentation, disposition by the utilization management medical director is rendered which typically falls into three categories: 1) approval of care; 2) proposal of alternative treatment; or 3) a deferral of disposition on the basis that further clinical information was necessary to make a determination. Non-approval of specialty service as not medically indicated was also a disposition option.

8

ECF 22-5 at pp. 3-4, ¶ 10. Getachew further explains that Dr. Ottey was no longer employed by Wexford as of November 9, 2015, and he states that Dr. Ottey was never involved in the decisions regarding Curtis's surgery or treatment of his papillomas. *Id*. at p. 4, ¶11.

## Non-Dispositive Motions

Curtis filed what amounts to a motion to reconsider this court's order denying his motion to request admission. ECF 21. In that motion, Curtis asserts that he is not seeking to conduct discovery; rather, he is attempting to get defendants to admit to certain facts asserted in his amended complaint. *Id*. This court denied the motion to request admission as improperly filed because discovery had not commenced in this case. ECF 20. While Curtis does not believe his request for admissions of fact amounts to discovery, his explanation as to why he wants defendants to respond to his requests is in fact a form of discovery. Furthermore, the existence of a genuine dispute of material fact is not gleaned from the evidence submitted by the parties in support of, or opposition to, summary judgment. The motion shall be denied.

Curtis also seeks discovery pursuant to Federal Rule of Civil Procedure 56(d)[4] and states in support that he is unable to adequately oppose defendants' motion for summary judgment without conducting discovery. ECF 26. Rule 56(d) provides:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts to justify its opposition, the court may:
>
>   (1) Defer considering the motion or deny it;
>   (2) Allow time to obtain affidavits or declarations or to take discovery; or
>   (3) Issue any other appropriate order.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448-49. However, "the party opposing summary judgment 'cannot complain

---

[4] Curtis cites to Fed. R. Civ. P. 56(f), which does not address discovery for purposes of opposing a motion for summary judgment. The court therefore assumes Curtis is relying on Rule 56(d), formerly 56(f).

that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f))

Notably, "'Rule 56(d) affidavits cannot simply demand discovery for the sake of discovery.'" *Hamilton v. Mayor & City Council of Baltimore*, 807 F. Supp. 2d 331, 342 (D. Md. 2011) (quoting *Young v. UPS*, No. DKC-08-2586, 2011 WL 665321, at *20, 2011 U.S. Dist. LEXIS 14266, at *62 (D. Md. Feb. 14, 2011)). "Rather, to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted), *rev'd on other grounds sub nom. Gardner v. Ally Fin. Inc.*, 514 F. App'x 378 (4th Cir. 2013) (unpublished). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir. 2008) (unpublished).

Curtis argues he needs discovery so he can find out who was responsible for supervising Dr. Ottey while Curtis was under his care; to obtain evidence regarding who was involved in the

collegial review processes when he was denied ENT consults and surgery; and to establish the policies relied upon by the parties who made decisions to deny him needed care. ECF 26. Curtis also cites to a three-year delay in providing him with needed care and implies that the 2012 consultation report written by Dr. Mumtaz indicating that Curtis needed surgery before his condition worsened meant Curtis was to be placed under the regular and ongoing care of an ENT regardless of any objective need for a consultation. *Id*. The evidentiary value of the information Curtis seeks to discover, as explained below, would not create a genuine dispute of material fact such that a reasonable jury could find in his favor.

**Standard for Summary Judgment**

Summary judgment is governed by Federal Rule of Civil Procedure 56(a), which provides in part:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting former Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant,

and draw all inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation v. Catrett*, 477 U.S. 317, 323–24 (1986)).

**Analysis**

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *accord Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Anderson*, 877 F.3d at 543.

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was

available. *See Farmer v. Brennan*, 511 U.S. 825, 834-7 (1994); *see also Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017); *King*, 825 F.3d at 218; *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Heyer*, 849 F.3d at 210 (quoting *Iko*, 535 F.3d at 241); *see also Scinto*, 841 F.3d at 228 (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839-40; *see also Anderson*, 877 F.3d at 544. Under this standard, "the prison official must have both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that his[/her] actions were inappropriate in light of that risk.'" *Anderson*, 877 F.3d at 545 (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference because 'prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through

13

circumstantial evidence tending to establish such knowledge, including evidence "'that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844; *see also Cox v. Quinn*, 828 F.3d 227, 236 (4th Cir. 2016) ("[A] prison official's response to a known threat to inmate safety must be reasonable.").

Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2001) (citing *Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)); *see also Jackson*, 775 F.3d at 179 (physician's act of prescribing treatment raises fair inference that he believed treatment was necessary and that failure to provide it would pose an excessive risk). While "a prisoner does not enjoy a constitutional right to the treatment of his or her choice, the treatment a prison facility does provide must nevertheless be adequate to address the prisoner's serious medical need." *De'lonta*, 708 F.3d at 526 (transgender inmate stated plausible claim in alleging defendant's refusal to evaluate her for gender reassignment surgery where current therapy failed to alleviate urge for serious self-harm).

The undisputed facts established on the record of this case support a finding that Curtis had a serious medical need as it was recognized as requiring treatment by a physician. Curtis argues that his condition – recurrent laryngeal papillomas – required regular visits to an ENT based on Dr. Mumtaz's August 14, 2012, post-surgical examination report that stated in part that Curtis would "need to be evaluated in three months and, depending on the recurrence rate, he

may need laryngoscopic biopsy again." ECF 13 at p. 7. While the court recognizes that Curtis would have preferred ongoing, regular evaluations by an ENT to determine if the papillomas had reoccurred, the failure to accommodate that preference does not state an Eighth Amendment claim. *See United States v. Clawson*, 650 F.3d 530, 538 (4th Cir. 2011) (right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable."). Further, there is no indication in Dr. Mumtaz's reports that he was recommending that level of treatment for Curtis. Rather, the reference to recurrence rate seems to indicate that another biopsy *may* be required should symptoms present again. This can be gleaned from the fact that at the time the August 14, 2012, report was written, Curtis had no evidence of any polyps or papillomas.

Also supported by the undisputed facts in the record is that there was a delay in providing Curtis with repeat surgery when he reported new symptoms indicating the papillomas had reoccurred in September of 2015. That delay, however, was not accompanied by a refusal to provide Curtis with any palliative care, nor did the named defendants deliberately cause Curtis to suffer needless discomfort. Rather, Curtis was prescribed prednisone, given Motrin, and when that no longer worked, prescribed Naproxen, and his respiratory health was monitored on a near-constant basis with normal results. Additionally, at least a portion of the delay was due to the need to change the surgeon and the hospital where the surgery would take place for reasons outside of the control of any providers treating Curtis at NBCI. The decision to delay sending Curtis to see an ENT specialist when the consult request was denied in October of 2015 is attributed to the objective observations of health care providers regarding the symptoms Curtis was experiencing at that time. That decision was quickly changed when the symptoms worsened

15

and Curtis was promptly sent to an ENT for examination. "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it . . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgment, even though such errors may have unfortunate consequences." *Grayson v. Peed*, 195 F.3d 692, 695- 96 (4th Cir. 1999); *see also Jackson*, 775 F.3d at 178 (describing the applicable standard as an "exacting" one). The record in this case, and the amended complaint itself, simply depicts the type of delays that one might expect in a large institutional setting with the now-familiar, cumbersome requirements for review and authorizations to obtain specialized care. This does not support the subjective component required for a finding of an Eighth Amendment claim. *See e.g.*, *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990), *overruled in part on other grounds by Farmer v. Brennan*, 511 U.S. 825, 837 (1994), *aff'd in pertinent part by Sharpe v. S.C. Dep't of Corr.*, 621 F. App'x 732 (4th Cir. 2015) (unpublished) (treatment rendered must be so grossly incompetent or inadequate as to shock the conscience or to be intolerable to fundamental fairness).

Curtis's assertions that he requires discovery in order to establish who was responsible for supervising Dr. Colin Ottey and what policies were relied upon to make the decisions regarding his care do not change the analysis. First, it is undisputed that Dr. Ottey left the employment of Wexford on November 9, 2015, and was not involved in the decisions leading up to Curtis's 2016 surgery. Curtis's treatment between 2012 and the date of his recurrence of symptoms in 2015 does not amount to an Eighth Amendment claim as there is no evidence, other than Curtis's assertions, that he required specialized care. With regard to the policies Curtis avers may have played a part in the decisions shaping the course of his healthcare, defendants have provided legitimate medical reasons for those decisions and there is no evidence that they were motivated by a disregard for his well-being in favor of saving money. Curtis's bald

assertion that Dr. Ottey and Krista Bilak caused a delay of three years in providing him with needed care is unsupported by any specific allegation against either defendant. Thus, the facts he seeks to establish are not essential to opposing the motion for summary judgment.

## Conclusion

By separate order, defendants' motion to dismiss or for summary judgment shall be GRANTED; Curtis's motions for admissions and for discovery pursuant to Rule 56(d) shall be DENIED; and Curtis's motion for appointment of counsel shall be DENIED as moot in light of the disposition of this case.

Dated this 11th day of February, 2019.

FOR THE COURT:

/s/
James K. Bredar
Chief Judge
